Rose Kaufmann, Petitioner, et al.,* v. Commissioner of Internal Revenue, Respondent.

Docket Nos. 12203, 12204, 12205, 12206, 12207.

Promulgated September 28, 1948.

*Edward I. Goldberg*, *Esq.*, for the petitioners.
*Stanley L. Drexler*, *Esq.*, for the respondent.

---

*Proceedings of the following petitioners are consolidated herewith: Minnie Hyman; Helen Frishman; Yetta Elinoff; and Columbia Holding Corporation.

484

OPINION.

OPPER, *Judge* :· That this proceeding comes within the purview, and is governed by the principle, of *Commissioner* v. *Court Holding Co.,* 324 U. S. 331, seems to us demonstrated by *Fairfield Steamship Corporation,* 5 T. C. 566. Not only the prevailing opinion, but that of the dissent, makes this clear.

The rationale of that case was that "the sale effected was in substance that which had been arranged while [petitioner] * * * held title" to the property (page 573). The record here shows that Hyman, who carried on all negotiations for the seller,[1] was president of the corporation; he was not a stockholder. He was negotiating for the sale of property of which the corporation, not the stockholders, was the owner. Whatever their final outcome, all of the negotiations were carried on, right down to the formulation and execution of the escrow agreement, while the corporate petitioner continued to hold title to the property. Petitioners do not, in fact, deny this, but insist in their brief merely that "the stockholders had legally obligated themselves to convey title to this property when they acquired the same in the future * * *. In our case * * * there were no negotiations for the sale of the property by the corporation with the final vendees whatsoever."

Even under the theory of the dissenting judges, these are stronger facts for respondent than those in the *Fairfield* case. There the dissent points out that before any negotiations were started, "The evidence is clear that the parties had decided to transfer the assets of [the corporation] * * * including" the property in question, "to Atlantic [the stockholder] in exchange for all of" the corporation's outstanding stock. "* * * it was only on September 19, after the transfer * * * that Lewis, as president of Atlantic [the stockholder], was authorized to conclude a contract * * *."

Here, the facts show, and are so construed by petitioners, that no steps whatsoever were taken toward liquidation until the deal for sale

---

[1] It does not assist the petitioner in the decision of doubtful issues of fact that he was not produced as a witness and that his absence was unexplained. See *Wichita Terminal Elevator Co.,* 6 T. C. 1158; affd. (C. C. A., 10th Cir.), 162 Fed. (2d) 513.

of the property had been conclusively agreed to. As the court said in *Trippett* v. *Commissioner* (C. C. A., 5th Cir.), 118 Fed. (2d) 764, affirming 41 B. T. A. 1254, Trippett and Meadows, the two sole stockholders there, "had no right to deal with the corporate property as their own. Texota Corporation had not been dissolved or liquidated and they could only act as its agents."[2] *George T. Williams*, 3 T. C. 1002, and *Acampo Winery & Distilleries, Inc.*, 7 T. C. 629, may be thus distinguished. Perhaps the view of the Fifth Circuit in *Howell Turpentine Co.* v. *Commissioner*, 162 Fed. (2d) 319, reversing 6 T. C. 364, was that the facts there were likewise reconcilable.[3] If not, we are, for the sake of uniformity, respectfully constrained to follow the contrary conclusions reached by us in the *Howell* and *Fairfield* cases.

The affirmance of the *Fairfield* case (C. C. A., 2d Cir.), 157 Fed. (2d) 321; certiorari denied, 329 U. S. 774, was, it is true, not placed upon the same grounds as those employed below. Regardless, however, of the reasons given, the cases are, in our view, identical, unless, as we have suggested, the present facts are more favorable to respondent.

There remains for consideration the point, insistently urged by petitioners, that the corporate petitioner was effectively disabled from making any sale of its property, and hence that the stockholders, and not the corporation, must have done so. Rejection of the proposition is required by the facts themselves. The corporation was no more bound not to sell than it was not to distribute its assets. Neither was a categorical prohibition; both depended upon paying off the corporation's bonds. This was actually done, in the ultimate outcome, out of the proceeds of the sale and new mortgage, which were obviously greatly in excess of what was needed to liquidate the bonds in cash.[4]

[2] We have found as a fact that petitioner's president had authority to institute negotiations for the sale of the corporate property. There being no evidence to the contrary, we have no basis for departing from "the presumption as to the authority of the president of a corporation" that he "represented the corporation, and prima facie he had power to do any act which the directors could authorize or ratify." *Hardin* v. *Morgan Lithograph Co.* (N. Y.), 247 N. Y. 332 : 160 N. E. 388. Even though an ultimately articulated contract of sale could not be executed by the president without, or probably even with, the authority of the directors alone, it is inconceivable that the negotiation of such a contract should be outside of the authority of the president. See 2 Fletcher, Cyclopedia Corporations, p. 462. "* * * some corporations can only be reached through their agents * * * In no other way can knowledge be conveyed to the fictitious entity or negotiations be had with it. It is not usual that parties dealing with a corporation to be brought before the directors to negotiate their contracts." *Balfour* v. *Fresno Canal Co.*, 123 Cal. 395 ; 55 Pac. 1062. Unless some corporate officer can participate in preliminary conversations, no proposal for the sale of corporate property could ever be arrived at for submission to the stockholders, and without that, of course, the functioning of a corporation and the transaction of its business would be fatally restricted.

[3] The opinion refers to "The contract of sale * * * reciting the impending liquidation, which had in fact been formally ordered before the contract was signed."

[4] It was actually testified by petitioner's secretary that "the corporation [petitioner] repaid us [the stockholders] by giving the individuals the title. The $120,000.00 was part of the consideration of the corporation giving the individuals title." On that theory, a sale by the corporation—and a capital gain—must have taken place irrespective of the second transfer of title. See *Fairfield Steamship Corporation* v. *Commissioner, supra.*

A contract to sell the property upon the simultaneous discharge of the bond indenture is nowhere shown to have been impossible, nor indeed, even difficult. We may take notice that such transactions are of common occurrence. And a contract with two prior conditions instead of one—release of the old mortgage and liquidation of the corporation—was in fact found to be entirely feasible. If it was lawful for the stockholders to contract to sell property which was not only covered by a mortgage and a court decree, but which they did not own, it must have been at least as lawful for the corporation which owned it to do the same.

There are no disputed evidentiary facts in the case. All of the witnesses who testified can be implicitly believed, and the ultimate fact remains, in our judgment, that the actual transaction started out and ended up by being a sale of the corporation's property negotiated through its chief officer, consented to, as it had to be, by its stockholders, and cast in a more complicated and indirect form from motives concerning which we find it unnecessary to speculate. The resulting gain was that of the corporate petitioner, and the tax must be determined accordingly.

Reviewed by the Court.

*Decisions will be entered for the respondent.*

---

KERN, *J.*, concurring: A rule of law might be inferred from the majority opinion to the effect that if any negotiations for the purchase of a corporation's property are begun while the corporation holds title to the property, then any sale of the property later made by the stockholders after the corporation's liquidation to a purchaser who had participated in such negotiations in any way and to any extent, must be considered the sale of the corporation under the doctrine of *Commissioner* v. *Court Holding Co.*, 324 U. S. 331.

Because of my doubt that such a rule of law is correct, and my view that, under the facts found, the decision reached by the majority is correct without resort to it, I am stating the grounds for my concurrence in this opinion.

The *Court Holding Co.* case was one of a series of cases decided by the Supreme Court which emphasized the importance of the "substance of a transaction," which should not "be disguised by mere formalities." In that case the Court held that "a sale by one person, can not be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title." This rule is applicable to those cases in which there have been negotiations between the corporation and the prospective purchaser of the corporate property resulting in a substantial agreement between the corporation and the purchaser

as to the sale of the property. If such a substantial agreement has been reached as a result of negotiations between the prospective purchaser and the officers of the corporation, then the later use of the stockholders of the corporation (by liquidation of the corporation) as "a conduit through which to pass title" will not change what is, in substance, a sale by the corporation to a sale by the stockholders. See *Fairfield Steamship Corporation* v. *Commissioner*, 157 Fed. (2d) 321, 322.

In the instant case, taking the facts as found, I am of the opinion that the negotiations between Louben, Inc., and the president of petitioner resulted in a substantial agreement for the sale of the property of the corporation, and the later agreement of the stockholders of petitioner was intended to give effect to the prior agreement of the corporation.

Samuel Hyman was president of petitioner corporation. As such, he was an agent for petitioner and was under obligation to act for the best interests of his corporation. With regard to any proposal to buy the property of the corporation, it is to be at least presumed that he would represent the corporation in conformity with that obligation in any negotiations instituted by Louben, Inc. It is certainly not to be presumed that his actions on behalf of his wife and daughter would affect his fiduciary obligation to the corporation. In any event, petitioner, although having the burden of proof, did not attempt to prove by the witness who was best qualified to testify on this point (Hyman, himself), that Hyman did not represent petitioner in the preliminary negotiations with Louben, Inc.

I would construe the facts found as follows: Hyman, as president of petitioner corporation, negotiated with Louben, Inc., with regard to the sale of the corporation's property on behalf of the corporation. When a substantial agreement had been reached as a result of these negotiations, Hyman then negotiated the method of carrying out the sale, and the method followed was the purported sale by the stockholders after liquidation of the corporation.

Under this construction of the facts, the rule of the *Court Holding Co.* case would be clearly applicable.

LEECH and ARNOLD, *JJ.*, agree with the above.

---

HILL, *J.*, dissenting: The deficiency herein is based on the respondent's determination that petitioner realized unreported gain on the sale by petitioner of the apartment house property to Louben, Inc. If such sale was made by petitioner, unreported gain thereon was realized as determined by respondent. The sole issue presented is whether petitioner made the sale in question or whether it was made by the individuals who were the stockholders of petitioner. Respond-

ent contends that petitioner made the sale. Petitioner contends *contra*. Most of the facts warranted by the evidence and some that are not are set forth in the majority report. I will point out and discuss below what I deem to be erroneous findings of fact in the majority report.

In support of the conclusion reached by the majority that petitioner made the sale in question, reliance is placed principally upon the holding in *Commissioner* v. *Court Holding Co.*, 324 U. S. 331, affirming 2 T. C. 531, and *Fairfield Steamship Corporation*, 5 T. C. 566. The *Fairfield* case was affirmed (CCA–2), 157 Fed. (2d) 321, but reference thereto is made in the majority report only in an incidental way. It is apparent that the reason for the slight attention paid to the Circuit Court's opinion rests in the fact that the Circuit Court affirmatively rejected as untenable the ground (here relied upon by the majority) on which this Court based its holding and affirmed this Court's decision on a ground which is not present under the facts in the instant case.

Unquestionably, all the evidence in the instant case supports the fact that the sale here in question was intended to be made, and was made, not by petitioner, but by the individuals who were the stockholders of petitioner. Moreover, the evidence in the instant case conclusively establishes that there was a complete liquidation of petitioner before the sale in question to Louben, Inc., was effected.

A similar state of facts was established in the *Fairfield* case, except in that case the Circuit Court held that there was not a liquidation. The Circuit Court, in its opinion in the *Fairfield* case, said:

A majority of the Tax Court thought, because the negotiations had been concluded by a satisfactory offer before the Fairfield Company transferred the ship, that the sale was to be imputed to that company. They did not hold, and indeed they could not properly have held, that as matter of fact the shareholders of the Atlantic Company ever meant the Fairfield Company to sell the ship; on the contrary the shareholders had most carefully provided the contrary. Thus, so far as the transaction depended upon the actual intent of the only parties who could have any intent, it is impossible to find support in the record for a finding that the Fairfield Company made the sale; and if that was the legal result of what they did, it was imposed upon the transaction in spite of their intent. The case is further complicated by the fact that the majority relied for their decision upon an interpretation of *Commissioner* v. *Court Holding Co.*, 324 U. S. 331, to which we cannot agree. On the contrary we think that the minority were right in believing that that case turned upon the fact that all the preliminary negotiations had been made expressly with the corporation; and that it was only after the bargain had been struck, that the service of a liquidation was brought in as *deus ex machina*. The contrary was true here.

The Circuit Court's statement above quoted carries its own proof of correctness and slips from under the majority opinion in the instant case the ground upon which the conclusion therein is based.

The *Court Holding Co.* case is not comparable in its facts either to the instant case or the *Fairfield* case. The Court Holding Co. owned as its sole asset an apartment house. Negotiation between it and its lessees of the property for sale to the lessees was entered into and the terms of sale were agreed upon. A certain amount of the purchase price was paid to the corporation. To avoid heavy taxes the property in question was transferred in the form of a liquidating dividend to the corporation's stockholders, who in turn completed the sale by conveying the property to the vendees on substantially the same terms agreed upon between the latter and the corporation. Also, in that transaction credit of the purchase price for the amount paid the corporation was given.

It is apparent, therefore, that the *Court Holding Co.* case can not properly be deemed authority for the holding of the majority in the instant case.

The evidence and the facts found by the majority show conclusively that on March 31, 1944, the stockholders surrendered for cancellation all of the outstanding shares of petitioner's stock and on that day received as a liquidating dividend all of petitioner's assets, including the apartment house property. This constituted a complete liquidation of petitioner and effected its dissolution. *Fairfield Steamship Corporation* (CCA), *supra*. The Circuit Court affirmed this Court in the *Fairfield* case on the ground that there had not been a liquidation of the Fairfield Steamship Corporation and hence no dissolution thereof at the time of the sale of the property there involved. Hence, the ground upon which the Circuit Court affirmed this Court in the *Fairfield* case does not exist in the instant case. It follows that on the basis of the facts here the Circuit Court's opinion is in direct opposition to the holding of the majority in the instant case.

The fact that petitioner's stockholders did not have title to the apartment house property during the negotiations for its sale by them was no legal deterrent to such negotiations and contract of sale. The stockholders were in control of petitioner. They knew that they could cause petitioner to carry out the liquidation plan whereby they would acquire title to the property through a liquidation distribution. They knew by reason of such circumstances that they would be in a position to effect a sale of the property in accordance with their contract so to do. In *Howell Turpentine Co.* v. *Commissioner* (CCA-5), 162 Fed. (2d) 319, the Circuit Court said:

But he may validly contract to sell it before any steps are taken towards liquidation, if he has a reasonable prospect of obtaining title to it within the time fixed by the contract for the conveyance. This is true of stockholders as it is of people in general who have a prospect of obtaining title and are willing to assume a personal liability if they should fail. "It is not unusual for persons to agree to convey by a certain time notwithstanding they have no title to the

land at the time of the contract, and the validity of such agreements is upheld. In such cases the vendor assumes the risk of acquiring the title and making the conveyance, or responding in damages for the vendee's loss of his bargain. \* \* \* Whenever one is so situated with reference to a tract of land that he can acquire the title thereto, either by the voluntary act of the parties holding the title, or by proceedings at law or in equity, he is in position to make a valid agreement for the sale thereof, without disclosing the nature of his title."

It may be appropriately noted at this point that the majority opinion goes *contra* to the Circuit Court's holding in the *Howell Turpentine* case, which case I here cite as authority in support of my individual views herein expressed.

The majority report recites as one of its findings of fact that:

A firm of attorneys was retained in connection with drafting the contract to sell the Center Court Apartments to Louben, Inc. Their charge for this was $1,500. Columbia's return for 1944 showed a deduction in the amount of $1,500 for "legal expenses."

It is obviously intended from this finding to convey the meaning that petitioner paid for attorneys' services in connection with the transaction of sale of the apartment house property to Louben, Inc. The evidence is positive and uncontradicted that the $1,500 for legal expenses referred to in the quoted finding of fact had no connection with the apartment house sale transaction. The uncontradicted evidence is that $1,500 for legal services was paid by the West Penn Realty Co., a partnership composed of petitioner's stockholders, and was paid for and on their behalf.

Among the findings of fact in the majority report is the following:

During the above negotiations and during subsequent transactions with Louben, Inc., Samuel Hyman was president of, and as such was authorized to negotiate for, petitioner. He was also authorized to act for his wife and daughters.

I respectfully submit that there is no evidence in the record to support the statement in such finding that Samuel Hyman was authorized to negotiate the sale in question for petitioner. The uncontradicted evidence on this point is to the effect that Hyman was authorized to negotiate the sale for the stockholders of petitioner, and that the negotiations and sale were accordingly made. Samuel Hyman was neither a stockholder nor a director of petitioner. To authorize him to negotiate the sale for petitioner, action therefor by the board of directors, ratified by the stockholders, would have been necessary. No such action either by the board of directors or by the stockholders is in evidence or was had. Certainly, Hyman had no such authority merely by virtue of the fact that he was president of petitioner.

Finally, the majority makes the following finding of fact as the capstone of its fact edifice herein: "The executed sale of the Center Court Apartments was in substance the sale of petitioner." This

alleged finding is a mere conclusion, but whether it is one of fact or of law appears debatable. If it is a finding of fact, it is without basis in the evidence, and, lacking such basis, it is incorrect as a conclusion of law. Therefore, in the light of the evidence it is unwarranted either as a conclusion of fact or of law. It is a conclusion which in effect holds that, since petitioner, if it had so chosen, might have sold the property to Louben, Inc., it will be held to have done so even though the evidence is positive and uncontradicted that petitioner never intended to make the sale, conducted no negotiations for the sale, made no conveyance of the property to Louben, Inc., received none of the purchase price therefor and, in short, did not in fact make the sale. In other words, such conclusion of the majority is based solely on speculative potentialities which had no factual fruition. Imaginary concepts based on mere potentialities may be formulated in many entertaining ways, but never properly as the basis of judicial inference.

For the reasons above indicated, I respectfully dissent.

Arundell, Van Fossan, Murdock, Black, and Tyson, *JJ.*, agree with dissent.