WEST COAST SECURITIES COMPANY (A DISSOLVED CORPORATION), PETITIONER, ET AL.,* *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 13922, 13923, 13924, 13925, 13926, 13927, 13928, 13929, 13930, 13931.

Promulgated May 29, 1950.

*George H. Koster*, *Esq.*, for the petitioners.
*R. G. Harless*, *Esq.*, for the respondent.

---

*Proceedings of the following petitioners are consolidated herewith : Dorothy Stewart, Transferee ; Marie McDonough, Transferee ; W. E. Clayton, Jr., Transferee ; Irene Kinner, Transferee ; Mary C. Smith, Transferee ; Dan S. Hewitt, Transferee ; W. A. Rabbett, Transferee ; L. E. Heller, Transferee ; C. L. Braskamp, Transferee.

948

950

OPINION.

ARUNDELL, *Judge*: The petitioner corporation herein contends that the Commissioner erred in determining deficiencies in income tax, declared value excess profits tax, and personal holding company surtax for the period January 1, 1943, to August 31, 1943, and claims that it is entitled to the determination of an overpayment of income tax in the amount of $18,519.54.

Initially, petitioner challenges the Commissioner's determination that it realized a long term capital gain in the amount of $106,534.80 as a result of a transaction whereby 47,000 shares of Transamerica stock were sold to the Transamerica Corporation on July 21, 1943.

The respondent rests his determination upon the principle established in *Commissioner* v. *Court Holding Co.*, 324 U. S. 331, arguing that the sale of Transamerica stock, although nominally made by the petitioner's stockholders, was in fact and substance actually made by the petitioner through the agency of its stockholders. In the *Court Holding Co.* case, the Supreme Court recognized that the question of whether a sale is to be regarded as having been made by a corporation or by its stockholders is a question of fact, to be determined in the light of all the attendant facts and circumstances. In respect to the construction of a doubtful transaction, the Court stated:

* * * The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by

another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

The salient facts relating to the sale in controversy may be outlined as follows: In the spring of 1943 the dissolution of the petitioner corporation was first discussed by its president and board of directors because of its unfavorable financial position at that time. Thereafter, a study was initiated to determine the best procedure for accomplishing its dissolution. During the course of this investigation, petitioner's president was advised by tax counsel that the best way for petitioner to handle matters would be to distribute its Transamerica stock in liquidation subject to the lien on it, as by this method the tax consequences would be less and there would remain some equity in the general assets for its stockholders. Therefore, the plan was proposed and subsequently executed whereby the Transamerica stock was distributed in kind to petitioner's stockholders incident to dissolution. The stock was thereafter sold by the stockholders to Transamerica, and the proceeds of the sale were applied in satisfaction of notes which had been secured by the pledge of the stock. In spite of the fact that the sale was made by petitioner's stockholders to Transamerica, the respondent contends that in substance the sale was actually made by the petitioner, and the stockholders were a mere conduit to carry out the sale.

In support of his contention that petitioner must be regarded as the actual seller, respondent states that the transaction was born of a preconceived plan for the avoidance of taxes, hastily executed, and devoid of a business purpose. It is argued by the respondent that no one except the petitioner received any benefit from the transaction, inasmuch as the stock was, at the time of its purported distribution, pledged with and in the possession of petitioner's creditors; the obligations owing to such creditors were in excess of the fair market value of the stock; and petitioner on the date of the sale reduced its indebtedness to the Bank of America so that the total amount owed by it to both the Bank of America and Transamerica exactly equaled the amount paid by Transamerica for the stock. Therefore, respondent concludes that it was never intended that the stockholders should receive either the stock or the proceeds of its sale, but, on the contrary, that they were intended to act simply as a conduit or agency through which the petitioner would effect the sale. We shall first direct our attention to the objections raised by respondent.

To our knowledge, the courts have never questioned the right of a taxpayer to select a course of action designed to minimize or to avoid altogether the imposition of tax where it is shown that the transaction as executed was in reality what it purported to be in form. As was

stated by the Supreme Court in *United States* v. *Cumberland Public Service Co.*, 338 U. S. 451:

Here the Court of Claims has found, on proper supporting evidence, that the sale in question was made by the stockholders rather than the corporation. * * * The subsidiary finding that a major motive of the shareholders was to reduce taxes does not bar this conclusion. Whatever the motive and however relevant it may be in determining whether the transaction was real or a sham, sales of physical properties by shareholders following a genuine liquidation distribution cannot be attributed to the corporation for tax purposes.

Furthermore, it appears that the financial difficulties from which the petitioner was suffering early in 1943 constituted ample justification for the petitioner's decision in favor of dissolution. Once this choice had been genuinely made, the petitioner clearly had the right to select the method of winding up its affairs which would offer it the maximum tax benefit. *Acampo Winery & Distilleries, Inc.*, 7 T. C. 629; *Steubenville Bridge Co.*, 11 T. C. 789. It is clear that, had petitioner sold the stock, the resulting tax on the capital gains would have served to reduce its assets on liquidation to a point where it would have been unable to discharge all of its outstanding obligations.

Although it is true that the stockholders never received actual physical possession of the shares of stock, they did receive a bill of sale which just as effectively transferred title to the stock to them. We are not inclined to accept respondent's conclusion that in these circumstances no one other than the petitioner received any economic benefit from the transaction. The fact that petitioner's stockholders never received actual physical possession of the shares of stock is explained by the fact that the shares were in the possession of two of petitioner's creditors, one of which creditors subsequently became the purchaser. Nor do we think that it was necessary for the stockholders to secure the release of the stock from the creditors, sell it to Transamerica, receive the proceeds therefrom and thereafter, as the transferees of petitioner's assets, channel such funds through the corporation to the creditors in discharge of their claims. In substance, what the stockholders did was to sell the stock to Transamerica and direct that the proceeds be applied directly to the obligations of the petitioner to Transamerica and the Bank of America for which the stockholders as transferees were liable. The ultimate economic benefit derived by the stockholders was that they were able to discharge the corporate indebtedness in full and at the same time protect in some small degree their equity in the corporate assets.

On the other hand, there is a striking absence in the instant case of those familiar facts and circumstances which the courts have consistently regarded as evidence that a corporation, rather than the shareholders, is the moving party in the sale of assets purportedly distributed in liquidation. There is no evidence that petitioner at any

time prior to dissolution entered into any negotiations for the purpose of disposing of the Transamerica stock itself. Cf. *Acampo Winery & Distilleries, Inc., supra; J. T. S. Brown's Son Co.*, 10 T. C. 840. On the contrary, all of the evidence shows that, from the time it made the decision to liquidate, petitioner understood that such stock would ultimately be distributed in kind to its stockholders upon dissolution. Cf. *United States* v. *Cumberland Public Service Co., supra.* No negotiations with any prospective purchaser for the sale of the stock were initiated by the stockholders until after liquidation was commenced. The petitioner participated in no manner in the negotiations between its stockholders and Transamerica prior to the sale, in the actual sale itself, or in the subsequent disposition of the proceeds. Cf. *Rose Kaufmann*, 11 T. C. 483; affd., *Kaufmann* v. *Commissioner*, 175 Fed. (2d) 28; *Wichita Terminal Elevator Co.* v. *Commissioner*, 162 Fed. (2d) 513; *Commissioner* v. *Court Holding Co., supra.* Moreover, it is clear that none of the stockholders who were active in the handling of the transaction from start to finish purported to represent the petitioner in any respect.

Therefore, it is our conclusion, based upon a careful consideration of all the material facts and circumstances, that the sale of 47,000 shares of Transamerica stock was made by the petitioner's stockholders to the Transamerica Corporation and that the respondent erred in his determination that the sale in reality was made by the petitioner and the petitioner was, therefore, subject to tax on the gain realized from the sale.

The second question for our determination is whether petitioner was entitled to a deduction of $43,577.50 which it claimed on its 1943 contends that it is entitled to the deduction either as a capital loss return as a result of compromising the Stewart notes. The petitioner under section 117, as a bad debt deduction under section 23 (k), or as a business loss under section 23 (f) of the Internal Revenue Code.

It appears that the petitioner had secured by purchase two notes executed by J. L. Stewart, of which the larger was secured by a second deed of trust on the Crest View Apartments and the smaller was secured by a second deed of trust on property known as the Crest View Garage. Having determined to dissolve the corporation, petitioner's directors agreed that it was necessary to realize cash quickly on the two Stewart notes in order to meet its debts and to make liquid funds with which to make distribution to its stockholders. To that end in July, 1943, petitioner offered to sell both Stewart notes to Transamerica at a reasonable discount. In a reply, Transamerica stated that it would not consider purchasing the notes for more than 50 cents on the dollar of the principal amounts and it based its attitude on the fact that an appraisal made by the Bank of America some nine months earlier had set the value of the Crest View Apartments

at $300,000 and the value of the garage at $20,000. Petitioner also offered the notes to the Bank of America, but the latter was not interested in their purchase. It expressed the same view as to the value of the properties as had Transamerica. On July 20, 1943, petitioner's board of directors authorized an officer of the company to negotiate with J. L. Stewart for settlement of the notes. The net result of the negotiations which ensued and which were carried on at arm's length was the settlement of the indebtedness at the figure set forth in our findings, which resulted in the petitioner receiving in settlement of the notes a sum resulting in the loss of $43,577.50 which the petitioner in this proceeding seeks to secure as a deduction.

If petitioner had sold the notes to a third person with the resulting loss that it has here suffered, there would seem to be no question that that loss would have been one recognized as a capital loss under section 117 of the Internal Revenue Code. But it is now too well settled to require extended discussion that the compromise of an indebtedness, whether it be based on inability to collect or by reason of anticipating the payment of the indebtedness, is not a sale or exchange within the meaning of the statute and, therefore, is not a transaction that falls under section 117. *Hale* v. *Helvering*, 85 Fed. (2d) 819; *Stoddard* v. *United States*, 49 Fed. Supp. 641.

There remains the question of whether the loss suffered by petitioner is deductible either as a bad debt under section 23 (k) or a business loss under section 23 (f) of the Internal Revenue Code.

A number of years ago the Supreme Court decided, in *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182, that the section of the law which deals with the deduction of losses and the section which deals with the deduction of bad debts are mutually exclusive and that an amount properly deductible under one section may not be deducted under the other. The instant case does not, in our opinion, present that question. The obligations which were compromised by the petitioner had not matured at the time of settlement and the compromise did not stem from any determination of probable worthlessness, but arose as a necessary incident of petitioner's liquidation. Testimony was offered by both parties bearing on the value of the security behind the notes, but we do not think decision is to be rested on a determination of value. The compromise of the indebtedness herein served completely to extinguish all obligations between the petitioner and Stewart, thus leaving no uncollectible debt outstanding which might be regarded as being worthless. Thus, unlike the situation presented in the *Spring City Foundry Co.* case, *supra*, the petitioner's right to a deduction arising out of the compromise agreement was from the very outset beyond the province of and unrestricted by the provisions relating to the deductibility of bad debts.

There is no disagreement between the parties that petitioner sus-

tained an out-of-pocket loss in the amount of $43,577.50 as a result of Stewart anticipating the due date of his indebtedness. The income tax is levied on a taxpayer's net income and, to determine such net income, all genuine losses actually sustained by the taxpayer during the taxable year in connection with regular business transactions or transactions entered into for profit are generally allowable. The treatment of such losses over the years has been varied under the revenue law, depending upon the nature and character of the transaction out of which the loss arose, the period of time during which the assets involved were held by the taxpayer, and the relationship between the parties to the transaction. If the notes in the instant case had been sold within six months of their acquisition to a third party, the loss suffered would have been deductible to its full extent.

By the same token, it is our opinion petitioner has suffered a bona fide loss in the amount of $43,577.50 in its transaction with Stewart. As we have pointed out, the dealings were at arm's length and genuine. We know of no case or provision of the statutes, or any reason which would preclude deduction of the loss in determining petitioner's taxable net income. We therefore hold that the petitioner is entitled under section 23 (f) to the benefit of a deduction in the amount of $43,577.50 representing a business loss incurred during the taxable period in question.

As a result of our determination that the petitioner is not taxable on the gain realized from the sale of the 47,000 shares of Transamerica stock and is entitled to a deduction for a business loss in the amount of $43,577.50, it becomes unnecessary for us to deal with the various other alternative issues raised by the pleadings.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

HILL, *J.*, dissenting: In disposing of the first issue the majority found as a fact that the sale of the 47,000 shares of Transamerica stock on July 21, 1943, was made by the stockholders of West Coast. Such an ultimate finding must inevitably rest on the fact that there was a genuine liquidation distribution by petitioner to its shareholders. See *United States* v. *Cumberland Public Service Co.*, 338 U. S. 451; *Howell Turpentine Co.* v. *Commissioner*, 162 Fed. (2d) 319; and *United States* v. *Cummins Distilleries Corporation*, 166 Fed. (2d) 17, 22. Also inherent in such an ultimate finding is the fact that the shareholders acted on their own responsibility and for their own account in negotiating the sale of the 47,000 shares of Transamerica stock. See *Howell Turpentine Co.* v. *Commissioner, supra;* *United States* v. *Cummins Distilleries Corporation, supra,* and *Amos L. Beatty & Co.,* 14 T. C. 52. I am convinced that neither of these two

essential prerequisites to the ultimate finding of the majority was present.

Turning first to the distribution of the Transamerica stock, it is all too clear that petitioner's shareholders received absolutely nothing of value therefrom, for the simple reason that West Coast had no distributable equity in these assets. On July 20, 1943, principal amounts of $54,300 and $147,481.25 were owing on the two notes held by Bank of America and principal amounts of $314,621.69 and $33,175 were owing on the two notes held by Transamerica. Thus, on that date the 47,000 shares of stock were pledged for indebtednesses totaling $549,577.94, though their market value was only $417,125. Therefore, the purported transfer achieved no business purpose whatsoever for the stockholders of West Coast acquired no equity in the property distributed to them. This was no genuine liquidation distribution, but a hollow formalism transacted solely to pass bare legal title to these assets to petitioner's shareholders. In substance and reality West Coast remained the actual owner of the stock at the time of its sale. *Gregory* v. *Helvering*, 293 U. S. 465.

It is equally clear that in entering into a contract for sale of the Transamerica stock, the stockholders of West Coast were not dealing for themselves independently, nor was it ever intended that they should do so. The detailed schedule for distribution of the Transamerica stock to petitioner's shareholders, its sale by them and application of the proceeds thereof to the notes held by Bank of America and Transamerica planned by the president of West Coast and a tax attorney prior to the commencement of dissolution proceedings, reveals the subordinate role in this transaction assigned to the stockholders. Furthermore, I find significance in the breathless speed with which commencement of the dissolution proceedings of West Coast, distribution of the Transamerica stock to its shareholders, negotiations for its sale, and, finally, the sale itself and the application of the proceeds to petitioner's indebtedness were accomplished. These circumstances dispel any notion that the sale was consummated by petitioner's shareholders independently and highlight the perfunctoriness of their role as conduits of title executing a plan conceived and controlled by West Coast. See *Wichita Terminal Elevator Co.* v. *Commissioner*, 162 Fed. (2d) 313. Nor did petitioner confine its own activity to distribution of the 47,000 shares of Transamerica. Petitioner displayed the true purpose lurking behind the facade of formalisms it had so scrupulously erected by stepping back into the transaction on the day of the sale to reduce the balance owing on its notes for which the Transamerica stock was pledged to the exact sale price of the stock. I can not regard it as a mere coincidence that the vendee of the Transamerica stock was one of its two pledgees, and that the secretary of West Coast arranged the terms of sale with Transamerica. In *Rose Kaufmann*,

11 T. C. 483, this Court laid great stress upon the fact that negotiations for the sale were carried on by an officer of the corporation, whose fiduciary duties placed him in the role of agent for his employer rather than as representative of the stockholders.

But an even surer guidepost towards the conclusion that the shareholders of Transamerica were not acting on their own responsibility and for their own account in selling the Transamerica stock is the total lack of benefit which resulted to them therefrom. West Coast received the entire proceeds of the sale of the stock by having them applied *in toto* toward the payment of its obligations. The shareholders received no part of the proceeds of the sale. The indebtedness of West Coast to the Bank of America and Transamerica was in no sense the liability of its shareholders. It is hornbook law that where, as here, transferees of pledged property take subject to indebtednesses, they are not personally liable for those obligations. In the light of reality, I can only regard the successive steps taken in the distribution and sale of the Transamerica stock as integral parts of a unified operation by West Coast having as its sole goal payment of certain of its debts by sale of corporate assets without the tax consequences inherent in such action.

I do not understand the rationale of *Commissioner* v. *Court Holding Co.*, 324 U. S. 331, to be that where negotiations for the sale of corporate assets commence after bare legal title thereto has passed to its shareholders, the subsequent sale must necessarily be attributed to the shareholders. On the contrary, that case emphasizes that determination of the tax consequences of such a sale depends on the substance of the transaction viewed as a whole, rather than on any one aspect thereof. Under the circumstances present in the instant proceedings the finding of the majority that the shareholders of West Coast made the sale exalts artifice above reality and, in the language of the *Court Holding Co.* case, permits "the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities." Cf. *Jones* v. *Grinnell*, 179 Fed. (2d) 873, which stated that the distribution as a liquidating dividend and the subsequent sale to the third person must be a bona fide reality in substance, as distinguished from the stockholders merely constituting a conduit through which to channel title from the corporation to the ultimate purchaser.

In the instant case there was in fact no distribution of the Transamerica stock to petitioner's stockholders, as will appear from the following summarized statements of unquestioned facts:

(1) The stock was pledged by petitioner for the payment of its debts beyond the value of the stock.

(2) The formality of the distribution to the stockholders was coupled with the binding condition that the stock be immediately sold

and the proceeds applied *in toto* toward the payment of petitioner's debts.

(3) Petitioner received the entire proceeds of the sale of the stock by having same applied *in toto* to the payment of its debts.

(4) The stockholders received no equity in the stock by the so-called distribution and received none of the proceeds of the sale thereof. And

(5) Nothing of value passed or was intended to pass to the stockholders by such purported distribution.

The majority also have held that petitioner was entitled under section 23 (f) of the code to deduct $43,577.50 as a business loss it claimed in 1943 as the result of compromising the Crest View Apartments note with Stewart. I can not agree. Since petitioner claims no deduction in reference to the Crest View garage note, no consideration of that note is necessary. At the time of the compromise agreement, Stewart was not in default in the payment of either principal or interest on the Crest View Apartments note. There is nothing in the evidence to show that West Coast or its shareholders, had the note been distributed to them in kind, would not have received the full value of the note at maturity. The only cause for the compromise settlement with Stewart was petitioner's determination to dissolve and the consequent necessity of quickly converting its assets into cash. The agreement of August 6, 1943, was simply a voluntary arrangement whereby a creditor, in return for prepayment of a considerable portion of an indebtedness, agreed to release a solvent debtor from further liability on the unmatured obligation. In my view petitioner has failed to show it sustained any recognizable loss as a result of this transaction.

For the aforementioned reasons, I therefore respectfully dissent.

TURNER, *J.*, agrees with the first point of this dissent.

DISNEY, *J.*, agrees with this dissent.