Cosby Realty Company, Inc., a corporation v. Commissioner.
Cosby Realty Co. v. Commissioner
Docket No. 46552.
United States Tax Court
T.C. Memo 1954-187; 1954 Tax Ct. Memo LEXIS 61; 13 T.C.M. (CCH) 1011; T.C.M. (RIA) 54293; October 29, 1954, Filed Paul Johnston, Esq., First National Bank Building, Birmingham, Ala., for the petitioner. M. Preston White, Jr., Esq., and J. Frost Walker, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined a deficiency in petitioner's income tax for the period January 1, 1950, to October 18, 1950, in the amount of $65,614.78. The issue is whether in a liquidation and distribution of corporate assets there was a taxable gain to the liquidated corporation. Findings of Fact Cosby Realty Company, Inc., sometimes hereinafter referred to as the petitioner or the Realty Company, was organized in 1933 under the laws of the State of Alabama; it filed a corporation income tax return for the period January 1, 1950, to October 11, 1950, with the collector of internal revenue *62 for the district of Alabama. Forms 966 and 1096 were filed in 1950, and Forms 1099L were also filed for each stockholder. Petitioner's principal place of business was in Birmingham, Alabama. The corporate charter authorized petitioner to engage in many activities but its principal business was that of owning and operating real property. On October 11, 1950, petitioner owned various parcels of real estate in Birmingham, Montgomery, Mobile and Gadsen, Alabama, and in Columbus, Georgia. All of this real estate was leased to the Cosby-Hodges Milling Company. The Cosby-Hodges Milling Company, hereinafter sometimes referred to as the Milling Company, was an operating company and held all the outstanding stock of other companies engaged in the same business. The Milling Company and its subsidiaries manufactured feed, corn meal, and self-rising flour. As of October 11, 1950, the names of the stockholders in the Milling Company and the Realty Company, and their interests in each company were as follows: Milling Co.
Realty Co.
Name
Shares
%
Shares
%
J. C. Hodges
1,461
18.2625
1
.20
Mrs. J. C. (Leonne C.) Hodges
1,477
18.4625
99 1/4
19.85
Mrs. Mildred H. Ferry
524
6.5500
29 1/2
5.90
W. C. Hodges
970
12.1250
20 1/4
4.05
J. C. Hodges, Jr.
970
12.1250
20 1/4
4.05
L. A. Brooks
200
2.5000
M. J. Roberson, Jr.
200
2.5000
Mrs. Nelle Gaston
1,099
13.7375
100 1/4
20.05
Mrs. Maybelle Morgan
1,099
13.7375
100 1/4
20.05
Mrs. Joyce Buchanan
29 3/4
5.95
Mrs. Maebelle M. Lester
29 1/2
5.90
Mrs. Nell C. Shelton
29 1/2
5.90
Wm. C. Morgan
20 1/4
4.05
James C. Morgan
20 1/4
4.05
Totals
8.000
100.0000
500
100.00
*63 Mrs. Ferry, W. Cosby Hodges and J. C. Hodges, Jr., are children of Mr. and Mrs. J. C. Hodges. Mrs. Hodges, Mrs. Gaston and Mrs. Morgan are sisters; their father was W. M. Cosby, the founder of the business in 1886. Mrs. Buchanan and Mrs. Shelton are daughters of Mrs. Gaston. Mrs. Lester, Wm. C. Morgan and James C. Morgan are daughter and sons of Mrs. Morgan. L. A. Brooks and M. J. Roberson, Jr., were officers and directors of the Milling Company and were not related to the Cosby or Hodges families. On October 11, 1950, the directors of the Milling Company and the Realty Company were: Milling Co.
Realty Co.
J. C. Hodges
J. C. Hodges
W. Cosby Hodges
Maybelle Morgan
J. C. Hodges, Jr.
Nelle Gaston
L. A. Brooks
M. J. Roberson, Jr. At some time prior to 1950 the management of the Milling Company decided it would be necessary to modernize the plant to improve its competitive position. From 1946 through 1950 the directors of the Milling Company discussed, considered and made plans for the plant modernization. In pursuit of the modernization plan, a 32-acre tract of land, located in Birmingham, was purchased. Cost estimates and revised estimates for building a *64 new mill were obtained. One engineering company submitted an estimate of $3,225,000, but on revision it was reduced to $1,800,000. Management of the Milling Company decided that $1,000,000 would have to be borrowed if the modernization plan were to be accomplished. And they decided that some rearrangement or integration of the Realty Company with the Milling Company would aid them in financing the loan. Following a decision to integrate the two companies, management requested a firm of certified public accounts to suggest a plan of integration. One of the members of this firm was L. F. Brown, and he had done other work for the companies. The firm prepared a memoranda dated August 7, 1950, setting forth the objectives, an outline of the plan, and comments. The objectives of the plan were: (1) Integration of interest and control; (2) obtaining stepped-up basis of assets of the Realty Company equal to fair market value; and (3) making it possible for stockholders to obtain cash for personal use at minimum income tax cost. The outline of the plan provided, first, for the liquidation and dissolution of the Realty Company. The stockholders would take undivided interests in its assets *65 in exchange for cancellation of their stock. Next, a new corporation would be organized with the stock wholly owned by the Milling Company. Then, the stockholders of the Realty Company would transfer its assets to the new company for cash and notes of the new company. In their comments the accountants stated that the liquidation of the Realty Company would result in capital gain to its stockholders. They suggested that the new corporation would be more flexible and that there would be income and excess profits tax advantages. In conclusion the memoranda suggested that the immediate steps to be taken were (1) to obtain appraisals of fair market values, and (2) consult an attorney as to the legal aspects and tax considerations. This integration plan was later discussed by the stockholders of the Realty Company and computations showing how this proposed plan would work for individual stockholders were prepared and submitted to the principal ones. It was envisaged by the drafters of the plan that only the stockholders of the Realty Company would have a taxable gain. A few weeks after the accountants' plan was submitted to the management of the companies, a law firm was engaged *66 to handle the details of the integration. The attorneys suggested that the mechanics of the liquidation could be facilitated by distributing the assets of the Realty Company to an agent who would make the sale and transfer the assets to the new company, and thereafter distribute the proceeds from the sale to the stockholders of the Realty Company. L. F. Brown was selected as the agent. Petitioner's property was appraised, and there were some discussions between the stockholders concerning the values of the property after the appraisals had been submitted. As a result of these discussions some of the values were increased. The following table shows the appraised value, the adjusted value, and the sales price of certain property sold in 1951: Property
Appraisal
Final
Sale
Birmingham
$135,000
$185,000
Gadsen
35,000
35,000
$40,000
Montgomery
35,000
37,500
Mobile
54,000
55,000
Columbus
41,430
41,430
41,430
Totals
$300,430
$353,930
At a meeting of the petitioner's board of directors called at the request of the stockholders and held on October 11, 1950, the following resolutions were passed: "RESOLVED, that the proper officers of the corporation *67 be and they are hereby authorized and directed for and in the name of the company to convey and transfer to L. F. Brown as agent and in trust for the holders of the capital stock of this corporation, in proportion to their holdings of stock, with full authority to sell, transfer, convert and otherwise deal with and dispose of all the assets of Cosby Realty Company, Inc., of every nature whatsoever real, personal and mixed, and wherever located, it being understood that no person purchasing or receiving from the said L. F. Brown any of the assets of Cosby Realty Company, Inc., shall be under the duty of seeing to the application of the proceeds or in anywise liable or responsible to the stockholders, their heirs, personal representatives or assigns, with respect to such assets or to account therefor, such transfer to include, in addition to the real estate, all stocks and other securities, cash on hand, prepaid items and other assets. "Such transfer or transfers are to be made for a recited consideration of $1.00, and in consideration of the agreement by the agent for stockholders on their behalf: "(a) To surrender for cancellation the stock certificates for all the outstanding *68 capital stock of this corporation immediately upon the execution during October, 1950, of an agreement for the dissolution thereof, and (b) for and in consideration of the undertaking of said agent to pay and discharge or to cause all debts and obligations of the transferor to be paid and discharged, including all costs and expenses of liquidation and dissolution not otherwise paid or discharged promptly as the same became due. "To the ends aforesaid, the said agent is authorized to make sale of the real estate, securities, prepaid items and other assets of this corporation to any other person, firm or corporation at such price or prices as he may determine or approve, provided that the purchase price for the real estate of this corporation shall be the sum of $353,930.00 agreed upon among the stockholders as the valuation thereof for the purposes of liquidation. "RESOLVED further that upon the transfer of said assets in liquidation, the said agent be and he is hereby authorized and directed to make sale of said real estate for a cash payment of $92,930.00, the securities for not less than $13,322.00, and to transfer prepaid insurance for not less than $3,337.54 which, together *69 with cash in bank to be distributed to said agent on liquidation amounting to approximately $25,516.23 shall result in total cash received or to be received by the agent on liquidation for the account of stockholders amounting to approximately $135,105.77, of which amount the sum of $130,500.00 is to be distributed currently to the stockholders, together with deferred notes for the balance of purchase price of the real estate amounting to $261,000.00 which are likewise to be distributed currently by said agent, who shall retain the sum of $4,605.77 for the payment of federal and state income taxes of the corporation accrued to date of liquidation estimated at $2,749.68, and for contingencies (estimated at $1,856.09), any residue not disbursed in payment of or upon the liabilities of the corporation to be subsequently distributed to stockholders by the agent. "RESOLVED further that the said agent be and he is hereby authorized to delegate any or all functions and duties contemplated hereby and relieve himself of all further obligations in the premises to the stockholders by turning over all of said assets received in liquidation to any corporation formed or to be formed which shall *70 acquire said real estate, for handling and distribution for the payment of debts and obligations of Cosby Realty Company, Inc., and for ultimate distribution of any balance to stockholders." Immediately following the directors' meeting a stockholders' meeting was held and they approved the resolutions adopted by the board. By an instrument entitled "COSBY REALTY COMPANY, INC., DISTRIBUTION IN LIQUIDATION," dated October 11, 1950, petitioner transferred all of its assets to L. F. Brown. The recital in the deed stated that Brown had been "designated as Agent by the several stockholders to receive for their account all of the assets of Grantor to be distributed on such liquidation." The instrument also authorized and directed Brown to sell the assets to any one person or firm at such prices as he may determine, provided "the real estate is to be sold for not less than book value ($100,326)." It was further provided: "It is understood and agreed that in consideration of the transfer in liquidation provided for herein, the Grantee herein does, for the account of all holders of the capital stock of the Corporation in the proportion of their holdings, assume and agree to pay and discharge *71 all of the debts and obligations of Cosby Realty Company, Inc., of every nature whatsoever accrued or to accrue to the date of formal dissolution thereof, and does further agree, on their behalf, that immediately upon the execution of an agreement of stockholders for dissolution of the Corporation, to surrender to the Corporation for cancellation the shares of stock issued by Cosby Realty Company, Inc., held by them respectively." On October 12, 1950, Brown and the Cosby-Hodges Development Company, hereinafter referred to as the Development Company, entered into an agreement wherein Brown would convey petitioner's assets to the Development Company for the consideration of $353,930. In addition to the real estate, Brown agreed to transfer cash, stock, bonds and other securities, which had been owned or held by the Realty Company at the time of its dissolution, to the Development Company to be held and administered for the stockholders of the Realty Company. These funds and other assets were to be held by the Development Company and applied by it from time to time to the obligations of the Realty Company, and any balance remaining was to be distributed pro rata to the stockholders *72 of the Realty Company. The Development Company was incorporated under the laws of the State of Alabama. The corporate charter was executed on October 12, 1950, and was recorded on October 13, 1950. One of the purposes for which the corporation was formed is as follows: "(1) To purchase from the stockholders of Cosby Realty Co., who hold or will acquire title by virtue of the dissolution and liquidation of said Company, or from their agent holding title for liquidation for their account, all of the real estate owned by Cosby Realty Company at the date of its dissolution. (This Corp. disclaims any purpose or intent to negotiate with the said Cosby Realty Co. for the purpose or intent to negotiate with the said Cosby Realty Co. for the purchase of any of its assets or to acquire any agreement between Cosby Realty Co. and any other person looking to the sale of assets by said Cosby Realty Co., it being understood that such negotiations will be solely with the stockholders of said Cosby Realty Company)." On October 18, 1950, the stock of the Development Company was held as follows: Milling Company, 47 shares; J. C. Hodges, W. Cosby Hodges, and J. C. Hodges, Jr., 1 share each. By *73 a deed dated October 12, 1950, Brown transferred the assets previously held by petitioner to the Development Company. In the deed the following was stated: "WHEREAS, the undersigned, with the approval of said stockholders in dissolution, has sold the real estate so acquired by the undersigned as agent, to Cosby-Hodges Development Company, a corporation, at and for the price of $353,930.00, of which the sum of $92,930.00 has been paid in cash to said stockholders, receipt of which cash payment is hereby acknowledged, and the balance of said purchase price, viz.: $261,000.00 has been paid in the form of promissory notes executed by Cosby-Hodges Development Company to the several stockholders in dissolution in the following amounts respectively: * * *
"NOW, THEREFORE, in consideration of the premises, and of the payment of said cash and notes aggregating $353,930.00, receipt of all of which is hereby acknowledged, the undersigned L. F. Brown, individually and as such agent, has bargained and sold, and does by this instrument grant, bargain, sell, transfer, assign and convey unto Cosby-Hodges Development Company, the following described real estate, to-wit: * * *
"In view *74 of the fact that the undersigned acquired title as agent for the said stockholders in dissolution, no right, title or interest in said property was vested in the undersigned individually, and hence the undersigned's wife did not acquire any dower, homestead or other right or interest therein, and she does not join in the execution of this conveyance." This deed was executed by "L. F. Brown Individually and as Agent." A dissolution agreement for petitioner was dated October 18, 1950, and was filed for record on October 23, 1950. The dissolution agreement was refiled on May 3, 1951, to correct a technical error in the original dissolution agreement. Brown opened a bank account in the name of "L. F. Brown, Agent" in the Birmingham Trust National Bank and deposited $130,500 on October 11, 1950. This sum, in two checks, one for $92,930 and another for $37,570, had been advanced to the Development Company by the Milling Company. On October 17, 1950, he deposited an additional $28,995.75 which was the remaining cash of the Realty Company. Brown distributed the $130,500 to the stockholders of petitioner and he transferred the $28,995.75 to the Development Company. Brown opened an account *75 with a brokerage firm in the name of "L. F. Brown, Agent." Through this account he sold the securities formerly owned by petitioner. The proceeds from the security sales were turned over to the Development Company. Brown did not pay the debts of the Realty Company. These debts were paid by the Development Company. Later, the construction contract for the new mill was awarded and the project was begun. Approximately $1,000,000 was borrowed by the Milling Company and the Development Company for the construction of the new mill. Petitioner's assets were sold by Brown as agent for the stockholders. Opinion In determining whether there is a tax liability resulting from the sale of petitioner's assets petitioner urges us to find that it did not sell its assets, and that it did not receive any gain from the sale. On the other hand, respondent contends that considering substance versus form, the sale of petitioner's property was made by, or on behalf of petitioner, and petitioner is taxable on the gain. The integration of the Milling Company and the Realty Company involved a series of steps, but reduced to the simplest concepts the integration was accomplished by the following *76 transactions: Petitioner transferred all of its assets to Brown as agent; Brown transferred these assets to the Development Company for money and promissory notes; the money and notes were distributed pro rata to petitioner's stockholders; petitioner was dissolved and its capital stock liquidated. Thus, for practical purposes, the integration was complete because the Milling Company owned 47/50ths of the outstanding capital stock of the Development Company. Prior court decisions, Commissioner v. Court Holding Co., 324 U.S. 331, and United States v. Cumberland Public Service Co., 338 U.S. 451, involving issues similar to the present one, have reduced a complex question of law and fact to the mere determination of a factual question. That question is whether the corporate assets were sold by the corporation or by the stockholders. [1] In the present case the corporate assets were sold by an agent so we must determine whether the agent represented petitioner or petitioner's stockholders.
*77 At the outset it should be noted that the corporation itself as distinguished from the agent did not effect, negotiate or enter into any agreement of sale with the Development Company. This tends to make the present case similar to the Cumberland Public Service Company case and distinguish it from the Court Holding Company case. See West Coast Securities Co., 14 T.C. 947, 959. We should look to the law of agency, not to determine whether Brown had the authority to act, but to determine whether the authority for his acts emanated from petitioner or petitioner's stockholders. In the law of agency, a principal is the person for whom another acts and from whom he receives his authority to act. The agent is the substitute or representative of the principal, who acts for and represents the principal, and who derives his authority from him. In the agency relationship the principal must intend that the agent act and the agent must accept the authority and act upon it. The essence of the agency relationship is the agent's authority to act, and the intention of the parties must be expressed in words or conduct. Now, from the record as a whole, who intended to be Brown's principal? *78 The entire liquidation was patterned on the premise that Brown would act as the agent of the stockholders. A sale by the petitioner was not contemplated nor executed. In fact there was evidence that the parties specifically intended to avoid a tax liability similar to that in the Court Holding Co. case where it was held that the corporation sold its assets. We have determined the ultimate fact that Brown was the agent for the stockholders and that as their agent he sold petitioner's assets which had been distributed in a bona fide liquidation. The fact that Brown did not have written authority from the stockholders to convey their property does not alter our decision. See Title 47, Section 22 of the Alabama Code, 1940. A similar question arose in Court Holding Co., supra, where it was held that failure to execute a written contract of sale as required by Florida law was "unimportant" since it was "found from the facts of the entire transaction that the executed sale was in substance the sale of the corporation." Here, under all of the facts, we have found that the executed sale was in substance the sale of the stockholders. Decision will be entered for the petitioner. *79 Footnotes
1. To prevent the determination of the tax consequences from being based on the formal manner in which the sale of a corporation's assets is effected, section 337(a)(1) and (2) of the Internal Revenue Code of 1954 states: SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS. (a) General Rule. - If - (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period. See also H. Rept. No. 1337, 83rd Cong., 2d Sess. (1954), p. 38, and S. Rept. No. 1622, 83rd Cong., 2d Sess. (1954), p. 48.↩