LEO SANDERS AND JESSIE H. SANDERS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

LEO SANDERS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JESSIE H. SANDERS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 46745, 46746, 46747. Promulgated March 29, 1954.

*Herman J. Galloway, Esq.*, and *John E. Marshall, Esq.*, for the petitioners.

*E. G. Sievers, Esq.*, for the respondent.

OPINION.

MURDOCK, *Judge:* The following allegation in the petition filed February 3, 1953, is the basis of the petitioners' first contention:

One of the matters between the petitioner and the government arising by reason of or in connection with Contract No. W–957–eng–968 was the taxability of amounts accrued or paid to petitioner under the contract and in settlement of claims in the year 1949, which was settled in one of a series of acts or steps in one entire transaction, as aforesaid.

Leo and his administrative assistant testified, in effect, that Gaines V. Palmes, the Justice Department attorney who had been assigned to represent the United States in the Court of Claims proceeding and who was participating in the negotiations for the settlement, had remarked to Leo in the course of the negotiations that Leo would not have any income taxes to pay and would not have any renegotiation if he accepted the settlement then being proposed by Palmes. Leo said that he understood from that time forward that he would have no taxes to pay on whatever amount he received in the settlement and was confirmed in that belief by a remark of the Acting Deputy Attorney General that all claims between him and the Government would be settled by the agreement. This contention of the petitioners and the testimony of Leo and his administrative assistant are inconsistent with the petitioners' return for 1949 filed on September 12, 1952, in which they reported the $14,100 and the $1,001.71 received in the settlement as ordinary income and the $940,000 as income taxable as a capital gain. They have never contended in this proceeding that the $14,100 and the $1,001.71 were not taxable income although the reason why those amounts would be treated differently under the settlement than the $940,000 is not apparent.

Palmes testified that he never told Leo that he would not have any taxes to pay if he accepted the proposed settlement but, on the contrary, remarked to Leo at one stage of the proceeding that he should not be so concerned about claiming additional amounts because he would have a tax problem as a result of whatever settlement was made and had better get a good tax lawyer. Palmes also testified

that he had no knowledge of what Leo's tax situation might be for the year 1949 or any other year when in June 1949 he was negotiating for the settlement of the claims of Leo against the Government. He had at one time asked to see Leo's income tax files to check costs being claimed by Leo, but the forms were blank and he obtained no information from those files. He and the other representatives of the Government who participated in the negotiations all testified that they never even considered as a factor in the settlement the taxes which Leo might have to pay as a result of the settlement and never had the slightest intention of agreeing in the settlement that he would have no taxes to pay on the amount which he was to receive. The Bureau of Internal Revenue was never represented in the negotiations. Neither Palmes nor any of the other representatives of the Government who participated in the settlement had any authority to agree that Leo would not be subject to income tax on the amount which he was to receive or to enter into any agreement with relation to his taxes. There is also evidence that they were well aware of their lack of that authority. The claims made by Leo made no reference to taxes, neither he nor his representatives in the negotiations ever in any way raised a question of taxes, and there is no mention of taxes in any of the settlement documents. Leo was represented in the negotiations by both legal and accounting counsel but they did not bring taxes into the discussions or require taxes to be mentioned in the settlement documents. There is no indication that they were ever aware that Leo thought his taxes were being settled. The claims being settled were those of Leo against the Government. The Government was not making any claim against Leo nor was it attempting to settle any claim against him. The representatives of the Government in the negotiations could have had no more than a vague idea of what the tax consequences of the payment to Leo might be and it is unreasonable to believe, in the light of all of the evidence, that they had any thought of relieving him of taxes on the amount he was to receive.

The Commissioner argues that those who represented the Government in the settlement could not have entered into an agreement which would prevent the properly constituted tax collecting officers of the Government from collecting from the petitioners whatever taxes would be due as a result of Leo's receipt of the amount in settlement of his claims. There is no necessity for going into the merits of that contention because the evidence fails to show that the settlement agreement actually entered into by Leo relieved him of any liability for income taxes on the amount received or to be received as a result of the settlement.

The petitioners argue in the alternative that the $940,000 constitutes a long-term capital gain received in exchange for claims against the

Government which were capital assets held for more than 6 months. Actually, the petitioners' claims were settled rather than sold or exchanged and section 117 would not apply in any event. *R. W. Hale*, 32 B. T. A. 356, affd. 85 F. 2d 819; *Charles E. McCartney*, 12 T. C. 320, 324; *West Coast Securities Co.*, 14 T. C. 947, 961. Likewise fatal to the petitioners' contention is the fact that the claims were for work performed by Leo in the ordinary course of his business under a contract with the Government and the belated payment for that work through the settlement was ordinary income to Leo just as it would have been had the Government paid him as the work was completed. Payments for work performed made to the person who performs the work by the person who engaged him to perform the work can not be changed from ordinary income into capital gains by the payor resisting the payee's efforts to collect for a period of time. *Swastika Oil & Gas Co.*, 40 B. T. A. 798, affd. 123 F. 2d 382, certiorari denied 317 U. S. 639; *Durkee* v. *Commissioner*, 162 F. 2d 184; *Nicholas W. Mathey*, 10 T. C. 1099, affd. 177 F. 2d 259, certiorari denied 339 U. S. 943. Cf. *Charles T. Fisher*, 19 T. C. 384.

Leo and his wife each claimed one-half of the depreciation on separate property of Leo which he used in his business and parts of which he sold in the years 1946, 1947, and 1948 and each reported one-half of the gain from the sales. The Commissioner allowed the deductions for depreciation to be divided between the two but included the entire gain in the income of the husband. Leo does not contest the action of the Commissioner in taxing the entire gain on this separate property to him but insists that he then should be allowed to deduct all of the depreciation. Unfortunately for him it has been held that in States which had community property laws similar to those of Oklahoma in effect during the years 1946 through 1948 (*John Miller Kane*, 11 T. C. 74, 78), the deductions pertaining to the separate property of one spouse are divided equally between husband and wife where the income from the property is community income taxable one-half to each spouse. *Mellie Esperson Stewart*, 35 B. T. A. 406, 411, affd. 95 F. 2d 821. The petitioners must take the tax disadvantages along with the tax advantages pertaining to taxpayers living in community property States.

The 1040 forms originally filed by the petitioners for each of the taxable years within the alloted time did not qualify as returns within the meaning of section 51 of the Internal Revenue Code in that they did not state specifically the items of gross income and the deductions and credits allowed. *Harrington Co.*, 6 T. C. 720, 724, 727. No returns for any of the taxable years which would qualify as returns under that section were filed until July 16, 1952, and September 12, 1952. Therefore, the additions to the tax for delinquent filing, as provided in section 291 (a), were proper and must stand unless the

petitioners have shown that their failure to make and file a return within the time prescribed by law was "due to reasonable cause and not due to willful neglect." *Michael Downs*, 7 T. C. 1053, 1060, affirmed on other grounds 166 F. 2d 504, certiorari denied 334 U. S. 832.

The principal excuse offered by the petitioners for failing to file adequate returns on time for the years 1943, 1944, 1946, and 1949 is that Leo was without funds after 1942 to have his books kept in accordance with the method theretofore established and that that situation continued until he received the money in the settlement on June 30, 1949. The books on the accrual method being used were completed in 1952 for the years 1943 through 1949 apparently on the basis of records of cash receipts and disbursements and supporting data kept currently during those years. It is not clear that acceptable returns might not have been timely filed on the basis of the information available at the end of each of the taxable years; but however that may have been, nevertheless, the question still remains as to why returns for 1943, 1944, and 1946 were not filed shortly after the June 30, 1949, settlement and why a return for 1949 was not filed on time. The excuse for this seems to be that the accountants whom the petitioner employed were busy with other work and did not complete Leo's books until 1952. The record does not show that the accountants were at fault in this connection or that the petitioners exercised due diligence and ordinary care and industry in seeing that the posting of Leo's books was completed promptly and the returns filed as soon as possible. The length of this delay is in itself sufficient to justify the full amount of the additions determined under section 291 (a) and the record fails to show that it was due to reasonable cause or that it was not due to willful neglect.

There is some evidence in the record to indicate that this delay, as well as the earlier period of delinquency, was due to willful neglect on the part of Leo. He concedes that he had income of about $95,000 for 1943, net income of about $13,000 for 1944, and income of about $160,000 for 1946 so that it is difficult to believe his contention that he had insufficient money during those years to maintain a proper set of books. Leo, during this period, was representing to the collector at Oklahoma City and also to a revenue agent attempting to investigate his tax liabilities for those years that he was short of funds, his books were incomplete, and consequently they would have to wait for examinations, returns, and taxes.

Leo may suggest that he relied upon the advice of accountants during the taxable years and that that was reasonable cause for his delay in filing the returns. The evidence does not show the qualifications as a tax adviser of any accountant employed by Leo during the taxable years or the advice, if any, which Leo relied upon. He employed a new firm of accountants in May 1949 who worked on his

books and prepared the returns which were filed in 1952. He also employed a lawyer as tax counsel in 1949 but the record does not show that he relied upon advice of any of these people or received any advice from them which influenced him in not filing the returns earlier. *West Side Tennis Club*, 39 B. T. A. 149, 160, aff'd. 111 F. 2d 6, 9, certiorari denied 311 U. S. 674; *Home Guaranty Abstract Co.*, 8 T. C. 617, 622. Cf. *William H. Gross*, 7 T. C. 837, 848; *Safety Tube Corporation*, 8 T. C. 757, 767, affirmed on other grounds 168 F. 2d 787.

Leo offers as another excuse the fact that his pending claims on the Oklahoma Aircraft Assembly Plant contract were not settled until June 1949 and that, in some way which he does not disclose, prevented him from determining what his income was for 1943, 1944, and 1946. The record shows that he completed the work on that contract early in 1943 and it does not appear that it affected his income for 1944 or 1946. He could have reported for 1943 the income from that contract which was not in dispute and other income properly accruable in that year. The inadequacy of this excuse is further disclosed by the fact that the returns were not filed until 3 years after the settlement was effected. All excuses have been carefully considered and have been found inadequate upon analysis.

The record does not show why the 1943 and 1944 deficiencies and additions were determined against Leo and Jessie jointly, for which years Leo filed separate returns and Jessie filed no returns. However, no point is made of this by the petitioners. Jessie was required to file a return for each of the years 1946 and 1949. She filed a separate return for 1946 on the community property basis and joined with Leo in the joint return for 1949. Taxpayers who are required to file returns must take full responsibility for any delinquency in filing those returns. A wife required to file a return because of income of her husband in a community property State or who joins in a joint return can not shed the responsibility for delinquency by saying that she relied entirely upon her husband, not a specially qualified tax authority; otherwise Congress would be frustrated in the purpose behind section 291 (a).

*Decisions will be entered for the respondent.*