W. O. ALLEN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 31798. Filed April 20, 1954.

*Graham Loving, Jr., Esq.,* and *L. Karlton Mosteller, Esq.,* for the petitioner.

*John P. Higgins, Esq.,* for the respondent.

OPINION.

Raum, *Judge:* 1. Petitioner filed separate returns for 1944 and 1945, but he and his wife filed a joint return for 1946 when a net operating loss in the amount of $67,204.06 was sustained. The tax years before us are 1944 and 1945, and the principal question is how much of the 1946 loss, if any, petitioner may take into account in computing the carry-back to be applied against his individual income for the 2 preceding years. Sec. 122, I. R. C. The mere fact that a joint return is filed does not entitle either spouse to utilize the composite net operating loss of both husband and wife for carry-back purposes. A net operating loss must be determined for each spouse measured by the income and deductions applicable to such spouse.

See Treas. Regs. 111, sec. 29.122-4 (e). So much is not in dispute herein; the problem is one of determining what portion of the $67,204.06 net operating loss for 1946 may be attributed to petitioner.

The Commissioner, relying upon the Oklahoma community property laws, has taken the position that petitioner is entitled to the benefit of only one-half that net operating loss, namely, $33,602.03. The petitioner, on the other hand, argues that the loss grew out of the operation of a business which was his separate property when the Oklahoma community property law was adopted on July 26, 1945, and that therefore the entire loss is allocable to him. In the alternative, he contends that at least part of the loss ($25,050.07) was caused by the cancellation of oil leases which were his separate property and that such part may not be divided between the spouses.

After the abortive attempt, tax-wise, to provide its citizens with an optional community property law (see *Commissioner* v. *Harmon*, 323 U. S. 44), Oklahoma enacted a new community property law, patterned after the law of Texas (see *Swanda* v. *Swanda*, 207 Okla. 186, 190, 248 P. 2d 575, 579; *John Miller Kane*, 11 T. C. 74, 78), which became effective on July 26, 1945.[2] At that time petitioner had been engaged for some years in the business of buying, selling, and operating oil properties, as well as acting as a broker on a commission basis for the purchase and sale of such properties. His wife had no investment in that business or its assets as of July 26, 1945.

[2] The complete text of the 1945 enactment is contained in Oklahoma Statutes, Supplement 1945, Title 32, Husband and Wife. It provides, in part, as follows:

Section 66. Separate property of husband.—All property of the husband, both real and personal, owned or claimed by him before marriage or before the effective date of this Act, whichever is later, and that acquired afterwards by gift, devise, or descent, or received as compensation for personal injuries, shall be his separate property. Laws 1945, p. 118, sec. 1.

Section 67. Separate property of wife.—All property of the wife, both real or personal, owned or claimed by her before marriage or before the effective date of this Act, whichever is later, and that acquired afterwards by gift, devise, or descent, or received as compensation for personal injuries, shall be her separate property. Laws 1945, p. 118, sec. 2.

Section 68. Community or common property.—All property acquired by either the husband or wife during marriage and after the effective date of this Act, except that which is the separate property of either as hereinabove defined, shall be deemed the community or common property of the husband and wife, and each shall be vested with an undivided one-half interest therein; and all the effects which the husband and wife possess at the time the marriage may be dissolved shall be regarded as common effects or gains unless the contrary be satisfactorily proved. Laws 1945, p. 118, sec. 3.

* * * * * * *

Section 72. Liability for debts—Exemptions.—That portion of the community property under the management, control, and disposition of the wife or which stands in her name shall be liable for debts contracted by the wife and for torts of the wife committed in the course of acquiring, holding, or managing such community property, but not otherwise. That portion of the community property, which is under the management, control, and disposition of the husband shall be liable for debts contracted by the husband and for torts of the husband committed in the course of acquiring, managing, holding, or disposing of the community property, but not otherwise. The husband and wife, and each of them, shall be entitled to the exemptions to which they, or either of them, are entitled under existing laws. All debts created by the husband and wife after marriage or after the effective date of this Act, whichever is later, shall be regarded as community debts unless the contrary be satisfactorily proved. Laws 1945, p. 119, sec. 7.

The parties have stipulated that $25,050.07, of the 1946 loss, represented a loss sustained from the cancellation or surrender of leases acquired by petitioner prior to July 26, 1945. These leases were his separate property prior to the effective date of the Oklahoma Community Property Act of 1945, and continued to be his separate property until canceled. Cf. *Schwartz* v. *McDaniel*, 202 Okla. 324, 231 P. 2d 568, 571. Had they been disposed of at a gain in 1946, and that gain represented the natural enhancement in the value of the leases, it would have constituted petitioner's separate income for income tax purposes. *Clanton* v. *Oklahoma Tax Commission*, 208 Okla. 92, 253 P. 2d 562; *Midyett* v. *Midyett*, 206 Okla. 312, 243 P. 2d 650, as explained in *Swanda* v. *Swanda, supra; Harmon* v. *Oklahoma Tax Commission*, 189 Okla. 475, 118 P. 2d 205. Similarly, the $25,070.50 loss attributable to these leases must be regarded as petitioner's separate loss.

The remainder of the 1946 net loss represented the excess of expenses with respect to the conduct of the business over income from the business. Petitioner argues that the business was his separate property as of July 26, 1945, the effective date of the applicable Oklahoma community property law, that it continued to be his separate property thereafter, and that therefore the loss in question was his separate loss. We cannot agree that this conclusion is supported by the record in this case.

To the extent that a loss can be traced to separate property it is a separable loss, but to the extent that it grows out of community property it is chargeable against the community. The respondent determined that the 1946 loss was a community loss, and the burden was on the petitioner to prove otherwise. He has carried that burden only as to the $25,050.07 loss resulting from the cancellation of his separately owned leases. He has not carried that burden as to the remaining loss growing out of the general operation of the business. A brief examination of the manner in which the business was conducted will make this clear.

Although the business was petitioner's separate property prior to July 26, 1945, it was thereafter operated for the benefit of the community. Profits were realized from commissions, rentals, bonuses, the sale of oil and gas, etc. The earning of these profits depended upon petitioner's managerial skill, acumen, and personal efforts. But in Oklahoma, such profits are community property, since, in the absence of a statute providing otherwise, "community property includes all property acquired by either spouse, during marriage, by toil, talent, energy or productive faculty, and the fruits and profits of the separate property of either spouse." *Swanda* v. *Swanda*, 207 Okla. at p. 190, 248 P. 2d at pp. 579–580. See also *Hammonds* v. *Commissioner*, 106 F. 2d 420, 422 (C. A. 10) ; *Harmon* v. *Oklahoma Tax Commission*, 189

Okla. at 478, 118 P. 2d at 209. Indeed, petitioner himself regarded the business in that light beginning July 26, 1945: Both spouses treated the profits from the operation of the business for the period July 26–December 31, 1945, as community income and the expenses incident to the production of that income as community expenses in their 1945 returns, each reporting as net income one-half of the excess of income over expenses as community net income. Cf. *Mellie Esperson Stewart*, 35 B. T. A. 406, 410, affirmed, 96 F. 2d 822 (C. A. 5); *Leo Sanders*, 21 T. C. 1012.

In 1946, petitioner's efforts to increase the income of the community resulted in expenses exceeding income for that year, and the source of the funds used to pay these expenses is far from clear on this record. There is evidence of substantial outstanding indebtedness as of the end of 1946, and the expenses may well have been paid in large part from funds borrowed after July 26, 1945, for the use and benefit of the community, which were expected to be repaid from subsequent income (community) of the business.[3] Also, the record before us suggests that other funds or assets of the business may well have been community property and that these might have been the source for many of the expenses paid in 1946.

That the business assets may have included substantial amounts of community property in 1946 becomes plain upon reflection. The Oklahoma community property law is not formulated in terms of annual periods. Income from the business was community property as it was realized. And as the number of profitable transactions increased, each resulting in community property that was not withdrawn, the funds remaining in the business became more and more a composite of separate and community property. The evidence discloses that many such transactions occurred after July 26, 1945.[4] Moreover, where there has been a commingling of separate and community property to such an extent that the component parts cannot be segregated, the commingled property is regarded as belonging to the community. *W. D. Johnson*, 1 T. C. 1041, 1053; *Hamilton-Brown Shoe Co.* v. *Lastinger*, 26 S. W. 924, 926 (Tex. Civ. App.); *Gorman* v. *Gorman*, 180 S. W. 2d 470 (Tex. Civ. App.); *Trapp* v. *United States*, 177 F. 2d 1, 6 (C. A. 10), certiorari denied 339 U. S. 913.

As already noted, the burden of proof in this case is upon petitioner. It was incumbent upon him to show what portion, if any, of the pay-

---

[3] To the extent of indebtedness contracted after July 26, 1945, section 72 quoted in footnote 2, *supra*, would seem to be applicable.

[4] For example, the item of "income from oil and gas sales" on the 1946 returns shows a loss of $26,191.66, but an accompanying schedule reveals that net income was realized in varying amounts from 40 royalty interests, and the composite loss shown for that item was the consequence of high operating and development expenses on 4 leases. Thus, to the extent that petitioner's wife's share of the profit on any particular transaction was not distributed to her, the assets of the business must be regarded thereafter at least pro tanto as community property.

ments which resulted in the net loss was made out of his separate property. That showing has not been made merely by establishing that the business was his separate property on July 26, 1945, for, as indicated above, community funds may well have been the source for such payments. Petitioner has not proved otherwise, and we cannot say on the record before us that the payments responsible for the net loss were made out of petitioner's separate property. Accordingly, we must hold that, apart from the $25,050.07 loss resulting from the cancellation of petitioner's separately owned leases, the net loss sustained in the operation of the business in 1946 was a community loss.

2. There remains the question whether the net operating loss sustained in 1946 should be reduced by the excess of percentage depletion over cost depletion experienced in 1944 before being applied as a net operating loss deduction against 1944 income. The pertinent provisions of section 122 of the Internal Revenue Code are set forth in the margin.[5]

---

[5] SEC. 122. NET OPERATING LOSS DEDUCTION.

(a) DEFINITION OF NET OPERATING LOSS.—As used in this section, the term "net operating loss" means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d).

(b) AMOUNT OF CARRY-BACK AND CARRY-OVER.—

(1) NET OPERATING LOSS CARRY-BACK.—

(A) Loss for Taxable Year Beginning Before 1950.—If for any taxable year beginning after December 31, 1941, and before January 1, 1950, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-back for each of the two preceding taxable years, except that the carry-back in the case of the first preceding taxable year shall be the excess, if any, of the amount of such net operating loss over the net income for the second preceding taxable year computed—

(i) with the exceptions, additions, and limitations provided in subsection (d) (1), (2), (4), and (6), and

(ii) by determining the net operating loss deduction for such second preceding taxable year without regard to such net operating loss and without regard to any reduction specified in subsection (c).

　　＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊

(c) AMOUNT OF NET OPERATING LOSS DEDUCTION.—The amount of the net operating loss deduction shall be the aggregate of the net operating loss carry-overs and of the net operating loss carry-backs to the taxable year reduced by the amount, if any, by which the net income (computed with the exceptions and limitations provided in subsection (d) (1), (2), (3), and (4)) exceeds, in the case of a taxpayer other than a corporation, the net income (computed without such deduction), or, in the case of a corporation, the normal-tax net income (computed without such deduction and without the credits provided in section 26 (h) and (i));

(d) EXCEPTIONS, ADDITIONS, AND LIMITATIONS.—The exceptions, additions, and limitations referred to in subsections (a), (b), and (c) shall be as follows:

(1) The deduction for depletion shall not exceed the amount which would be allowable if computed without reference to discovery value or to percentage depletion under section 114 (b) (2), (3), or (4);

(2) There shall be included in computing gross income the amount of interest received which is wholly exempt from the taxes imposed by this chapter, decreased by the amount of interest paid or accrued which is not allowed as a deduction by section 23 (b), relating to interest on indebtedness incurred or continued to purchase or carry certain tax-exempt obligations;

(3) No net operating loss deduction shall be allowed;

(4) The amount deductible on account of losses from sales or exchanges of capital assets shall not exceed the amount includible on account of gains from such sales or exchanges. The deduction provided in section 23 (ee) shall not be allowed.

　　＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊

(6) There shall be allowed as a deduction the amount of tax imposed by Subchapter E of Chapter 2 paid or accrued within the taxable year, subject to the following rules—

The parties agree that the amount of the net operating loss sustained in 1946 should be reduced by the percentage depletion (in excess of allowable cost depletion for that year) as provided in section 122 (d) (1) in arriving at the net operating loss carry-back to 1944. They also agree, in accordance with section 122 (b) (1), that if a net operating loss occurs in a year beginning before 1950, such loss must be carried back to the 2 preceding taxable years and be applied first to the earliest of those 2 years, and that, in accordance with section 122 (c), the amount to be applied as a net operating loss deduction for the earlier year is the amount of the net operating loss carry-back reduced by the amount, if any, by which the net income computed with the exceptions and limitations provided in section 122 (d) (1), (2), (3), and (4) exceeds the net income (computed without such deduction).

The petitioner urges that his net income for the year 1944 computed with the exceptions and limitations provided in section 122 (d) does not exceed his net income for that year computed without the net operating loss carry-back deduction. We do not agree. His net income for 1944 was $33,981.36. This figure includes no adjustment for the exceptions and limitations set forth in section 122 (d). Subsection (1) of that section limits the deduction for depletion to the amount which would be allowable if computed without reference to discovery value or to percentage depletion. When his net income for 1944 is computed applying this limitation, $12,712.03 must be added for percentage depletion, resulting in net income of $46,693.39. Since this net income (as adjusted pursuant to section 122 (b)) exceeds the net income computed without the net operating loss carry-back deduction by $12,712.03, the net operating loss for 1946 must be reduced by $12,712.03 before it can be applied to the net income for 1944.

*Decision will be entered under Rule 50.*

(A) No reduction in such tax shall be made by reason of the credit for income, war-profits, or excess-profits taxes paid to any foreign country or possession of the United States;

(B) Such tax shall be computed without regard to the adjustments provided in section 734; and

(C) Such tax, in the case of a consolidated return for excess-profits tax purposes, shall be allocated to the members of the affiliated group under regulations prescribed by the Commissioner, with the approval of the Secretary.