**A. L. WASSON and wife, Mattie Pallmeyer Wasson, Appellants,**

v.

**UNITED STATES of America, Appellee.**

No. 16578.

United States Court of Appeals Fifth Circuit.

Jan. 7, 1958.

Rehearing Denied Feb. 28, 1958.

Grover Cunningham, Jr., Big Spring, Tex., for appellants.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Ellis N. Slack, Robert N. Anderson, Davis W. Morton, Jr., Attys., Dept. of Justice, Washington, D. C., Heard L. Floore, U. S. Atty., Fort Worth, Tex., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and WISDOM, Circuit Judges.

HUTCHESON, Chief Judge.

Based upon a claimed net operating loss carry-back from the calendar year 1951, the suit was for the recovery of income taxes overpaid for the calendar year 1950. Tried to the court without a jury, there were findings of fact and conclusions of law, not reported, rejecting plaintiffs' claim on the general ground, as to each of its elements, that taxpayers failed to sustain their burden of proving the claimed 1951 net operating loss carry-back deduction against 1950 income, within the meaning of Secs. 23 and 122(d) of the Internal Revenue Code of 1939, 26 U.S.C.A. §§ 23, 122(d).

Appealing from the judgment, plaintiffs are here attacking the findings and conclusions that were adverse to them, and under seven numbered points,[1] urging with vigor and conviction that the court erred in so finding and holding.

As the taxpayers see the case, while they devote more time to and argue more earnestly point No. 1, because of its greater effect on the general result they argue each of the other claims of error with conviction, insisting as to each that it is well taken and requires a reversal.

Appellee sees the case differently. It recognizes the great significance of the holding attacked in point No. 1, and its effect upon the case, and argues this point with vigor and earnestness. As to the other points, while it does insist that none of them are well taken, it

---

1. Point 1. The court erred in treating the losses shown on the records of A. L. Wasson as community losses of himself and his second wife for the reasons that (a) such losses were traced to the partnership of which A. L. Wasson was a member and, under the undisputed evidence and Texas law, were not community losses but the separate losses of A. L. Wasson; and (b) in the alternative, the loss of one of the partnerships was the separate loss of A. L. Wasson by virtue of the prenuptial agreement between taxpayers.

Point 2. The court erred in its conclusion No. 6 as to the unrecorded transfer from the partnership to the taxpayer of 508 head of sheep.

Point 3. The court erred in not making adjustment for the wool inventory included in the income of Wasson and Carter, so as to put Wasson's 1950 income on a cash basis.

Point 4. The court erred in holding that contributions were not properly a part of the loss carryback.

Point 5. The court erred in not permitting appellant to offer evidence on cost depletion.

Point 6. The court erred in approving the computation of the adjustment for capital gains in connection with the net operating loss.

Point 7. The court erred in its conclusion No. 10, in holding that the conceded $50,000 worthless mineral deduction fell clearly within the term "trade or business" in Sec. 22(n) (1), I.R.C. 1939, 26 U.S.C.A. § 22(n) (1), and for that reason denying taxpayers' attempt to increase their contributions.

argues them in more or less cavalier fashion on the theory, stated by it in its argument on point No. 5, that, unless the claim of error with respect to point No. 1 is sustained, there will be no loss carry-back, and if it is sustained and the whole loss is allowed, it will be sufficient to wipe out the entire 1950 tax.

As to point No. 5 for instance, relating to cost depletion, appellee, after categorically stating that it is of no consequences on this appeal because no claim was made for it in the claims for refund, no offer of proof was made at the trial, and no exception taken to the judge's ruling, and accordingly it is not a proper issue here on appeal, goes on to say: "In all events the issue is academic since the claimed 1951 operating loss carry-back deduction depends essentially on taxpayers' erroneous contention, points 1(a) and (b), made with respect to the district court's disallowance of Mrs. Wasson's moiety of the 1951 community loss, viz., $53,678.02 for purposes of this appeal, and the 1951 operating loss carry-back deduction would still be zero if the percentage depletion adjustments under Sec. 122 of the 1939 Code were left out of account altogether."

Certainly it is the case that the issue of the character of the property loss and, therefore, the nature of the loss, whether community or separate, is the dominant point in this case. We turn, therefore, to its consideration, noting with respect to it that the court, after finding that Wasson was a widower from August 27, 1950 until September 3, 1951, when he married his present wife, that she had no income between Sept. 3, 1951 and December 31, 1951, from her separate property, further found:

"10. A. L. Wasson's books for 1951 show losses (largely sheep and cattle losses) which he contends were his separate losses and should be used in computing his net operat-

ing loss carry-back from 1951 to 1950. The Commissioner of Internal Revenue disallowed one-half of the losses incurred between Sept. 3, 1951, and Dec. 31, 1951, determining that this portion of the loss was a community loss attributable to Mrs. Mattie Pallmeyer Wasson and not allowable to A. L. Wasson for carry-back purposes against his income and that of his former spouse, Mrs. Mattie Wasson, for the taxable year 1950."

"11. Considering all the testimony and exhibits, the losses (referred to in par. 10, supra) occurred between Sept. 3, 1951 and Dec. 31, 1951. The evidence does not indicate that the losses occurred earlier in the taxable year, prior to this second marriage."

and, on the basis of these findings, concluded:

"3. That the Commissioner's allocation of $48,550.98 of the 1951 loss to Mattie Pallmeyer Wasson as a part of the community operation was correct. The losses in this case were largely sheep and cattle losses. Clearly, any increase of the livestock would have been community gain. It has not been shown that there was no increase of the livestock between the time of the taxpayer's second marriage and the end of the year. Any loss attributable to the decrease of the livestock was community loss. The taxpayer has the burden of showing that the loss was separate. Allen v. Commissioner, 22 T.C. 70. This burden was not met."

It is appellant's position: that these findings and conclusions are patently and inherently wrong; that, in making them, the court has incorrectly disregarded the compulsive nature and effect of the evidence, including particularly the time factor in the second marriage, and of the controlling principles of law; that, under the undisputed facts of record

and the law of the Texas cases, these findings and conclusions may not stand.

Appellee, on its part, pointing to the findings and conclusions, urges upon us that the district court correctly held that Mr. Wasson failed to sustain his burden of proving that the 1951 sheep and cattle losses were not, as agent Hawkins testified by way of conclusion they were, losses of property belonging to the community of the second marriage with one-half of them, therefore, belonging and attributable to the second wife and hence not available to him for carry-back purposes, but, on the contrary, were losses of his separate property and wholly available to him.

Insisting that the burden of proving a separately available 1951 loss carry-back deduction *made it incumbent upon Wasson to show that the 1951 operating losses occurred prior to his second marriage, and pointing to the finding of the district court that the heavy 1951 losses all occurred between September 3, and December 31, 1951,* appellee, quite incorrectly we think, insists that it is thereby established that Wasson failed to sustain his burden of showing that the 1951 loss claimed was of separate instead of community property.

It recognizes, however, the bizarre, indeed the almost fanciful nature of the agent's conclusional testimony, on which the district judge based his findings and conclusions, (1) that of the heavy sheep and cattle losses sustained in 1951, none of them occurred prior to August 30, 1951, but all were suffered in the last four months of the year, (2) that none of the sheep and cattle lost were the original stock constituting the separate property of the taxpayer but all were increase thereof born after August 30th and before December 31st. Hard put to it, therefore, to point to any evidence or any theory of law upon which it can hope to justify the decision below, that the taxpayers as a community sustained losses consisting wholly of the offspring of Wasson's separate property,

born and dying in the last four months of the year, except the greatly over-worked one that the burden was upon the taxpayers to make out their case and they failed to sustain the burden, returns in its brief again and again to the theme thus stated by it on page 25:

"We emphasize the burden incumbent on the taxpayer with respect to the carry-back deduction herein claimed because of the unusual mode of proof taken by the taxpayer in this proceeding. The principal witness called by both taxpayer and by the government was Ben Hawkins, the Revenue Agent. * * * He explained his adjustment and the reasons therefor. All of the computations here involved * * * are based on his unrefuted testimony. No convincing contradictory evidence with respect to these adjustments was introduced although Wasson's testimony was, in one respect at least, directed to that end. Wasson testified that sheep losses on the * * * New Mexico ranch occurred in the spring of 1951 immediately prior to the transfer of 508 head, down to his Red House ranch in Big Spring, Texas, in July of that year."

After stating that this self serving testimony is directly refuted by Agent Hawkins' testimony on direct, as taxpayer's witness, the appellee concludes:

"With respect to this testimony, the District Court concluded that *while 'there is some question in the record as to just when these losses occurred, whether before or after the taxpayer's second marriage',* he had *'failed to meet his burden of proof',* and the trial judge found that, under all the evidence, *'the losses * * * occurred between Sept. 3, 1951 and Dec. 31, 1951.'"* (Emphasis supplied.)

Pinpointing the wholly inconclusive and conclusional nature of the testimony

of Agent Hawkins, on which the findings and conclusions of the court and the argument of the appellants are based, by setting it out in question and answer form,[2] the taxpayers meet appellee's arguments and assumptions head on.

They meet them in fact by pointing to Wasson's uncontradicted and entirely reasonable testimony[3] and contrasting it with the wholly unsupported, indeed unwarranted conclusion of the agent that all of the losses occurred after August 30th, completely contradicted as it was by his statement that he arrived at his conclusion by the book method that the method used by him "would not have reflected any death loss", and that in answer to the question *"That if there had been a considerable death loss or one thing or another concerning these sheep then that would not show up as a result of your allocation that you have made?"*, he answered, *"That is right, Sir."* (Emphasis supplied.)

2. Q: "All right, now, this adjustment for one-half of the community loss, would you please explain to the court how you arrived at that figure of $48,550, whatever it is? Let's get the exact amount, $48,550.98. A: For the year 1951 I took the trial balances—the trial balance that they used in preparing Mr. A. L. Wasson's 1951 return, located the ledger sheets for each amount on it, took off a trial balance at Aug. 31, 1951, and determined loss or profit for the period Jan. 1, through Aug. 31, 1951, and a loss of profit from Sept. 1, 1951 through Dec. 31, 1951, with *the exception of items that I considered to be separate income to Mr. A. L. Wasson, royalty, oil royalty, and sales or exchanges of capital assets.*
Q: "What about partnership losses, were they, did you do the same thing for the partnerships? A: Yes.
Q: "That were involved? A: *Yes, for each partnership I took a trial balance at Aug. 31st and allocated the profit or loss based on the trial balances between the period Jan. 1st to Aug. 31st to Dec. 30th.*
Q: *"Did you make any allocation for items which would accrue throughout the entire year that would only be charged off of the books as of the end of the year?* A: No, sir.

They meet them in law by calling attention to the statement in the court's conclusion No. 3, *"The losses in this case were largely sheep and cattle losses. Clearly any increase of the livestock would have been community gain. It has not been shown that there was no increase of the livestock between the time of the taxpayer's second marriage and the end of the year."* (Emphasis supplied), and his conclusion in effect that because of the failure of the taxpayer to show that there was no increase of the livestock between the time of the taxpayer's second marriage and the end of the year, the taxpayer did not meet his burden.

Saying only that there was no warrant for the action of the court in rejecting the testimony of Wasson that his losses occurred in the spring and concluding that none of these heavy losses occurred in the first eight months of the year but all of them were in the last four months

Q: *"How did you arrive at the inventory as of Aug. 31st?* A: *By the only method available to me, the book method, the number on hand plus the number purchased less the number sold.*
Q: *"Would that have reflected any death loss?* A: *No, sir.*
Q: *"It would not?* A: *No, sir.*
Q: *"That if there had been a considerable death loss or one thing and another concerning these sheep then that would not show up as a result of your allocation that you have made?* A: *That is right, sir."* (Emphasis supplied.)

3. In answer to the question when the major portion of the losses occurred in 1951, Wasson answered that they bought the sheep and cattle right after the first of the year, that they put the sheep on the ranch and they began to lamb out early, that there came no more rain, that they had lambed out 3200 lambs, that there was no grass and they had to move, and that they lost all of the lambs, and a good many of the ewes died.
Asked, "Did this death loss occur prior to the fall?", he answered: "Oh, yes, it did that spring along in May and June."

of it, we put to one side for the present the court's rejection of taxpayer's uncontradicted, unimpeached, and wholly reasonable testimony that heavy losses were sustained in the spring of 1951, the natural lambing time.

■ We do this because the implied, if not stated, *conclusion of the court that none of the losses for which claim was made, whether occurring before or after August, 1951, were of Wasson's separate property but all were of the increase thereof and were born and died within the four months from August 30 to Dec. 1st,* is, on its face, unreasonable, indeed impossible, not only because it is not supported but is contradicted by all the credible testimony, but because it is completely contrary to facts of animal husbandry, of which the court takes judicial knowledge.

We do this, too, because the substance and effect of the findings and conclusions of the district court, that the livestock losses of more than $100,000 occurred in the short space of four months after the beginning of the second community and are all presumed to be community in the absence of specific proof showing the contrary, is contrary to, indeed in the teeth of the Texas Separate and Community Property system and laws as established in and by the Texas Constitution and Statutes, Vernon's Ann.St. Const. art. 16, § 15, Vernon's Ann.Civ. St. art. 4619, declaring what is *separate* and what is *community property* in Texas, and all the Texas decisions [4] thereon, beginning with Schmidt v. Huppman, 73 Tex. 112, 11 S.W. 175, and continuing down to date.

It is quite plain from the district judge's conclusions that he recognized that the *Texas community system deals with property and substantial property rights,* since he finds not that mere theoretical accounting could convert

separate into community property but that the increase if any of the Wasson's separate livestock would have been community, and if there was loss of such increase this would be a community loss. His error proceeds from the non sequitur contained in the same paragraph 3, that *"any loss attributable to the decrease of the livestock was community loss."* (Emphasis supplied.) In so stating, the district judge went directly counter to the preceding statement which was *that any increase of the livestock would have been community gain and any loss of such increase would have been community loss.* (Emphasis supplied.)

■ In the same way, while the district judge correctly stated that the theoretical burden of showing that the loss was separate was on the taxpayer, when he declared "This burden was not met", he simply overlooked the fact that, while in any situation really involving conflicting claims of separate and community property where there has been a commingling, the presumption is in favor of the community, this presumption is a reasonable one and cannot arise in this case under the undisputed evidence, including the brief time factor establishing that within the meaning of the decisions, no commingling has, or could have, occurred.

No case in the books has been cited to us, we have found none, in which under circumstances of this kind it has been held that a spouse who brought into the marriage large amounts of separate property, as here livestock, is put upon specific proof that that separate property had not, within the short period of four months, such as here been commingled with and converted into community property.

■ We think that the district judge's conclusion in this case, that because of

---

4. Farrow v. Farrow, Tex.Civ.App., 238 S.W.2d 255; Barrington v. Barrington, Tex.Civ.App., 290 S.W.2d 297; Blumer v. Kallison, Tex.Civ.App., 297 S.W.2d 898;

Irma Jones Hunt, 47 B.T.A. 829; and Schmidt v. Huppman, 73 Tex. 112, 11 S.W. 175.

the agent's conclusional testimony that no losses occurred prior to August 30th, the burden of proof was on the taxpayer to show, and he had not shown, that there had been no commingling of his separate with community property, and that, therefore, one-half of the admitted livestock losses must be held to be of community property, is running a good principle into the ground. If the shoe were on the other foot and it was Mrs. Wasson who was claiming the loss carry-back against her income of 1950, the United States and the district judge would rightly make short shrift of her claim that one-half of the losses were available for her use, the fact that she cannot make and does not attempt to make use of them cannot change or affect the inescapable conclusion that the losses were of Mr. Wasson's separate property and, therefore, his losses.

Because of these views, we find it unnecessary to deal with appellant's contention under 1(b) that the pre-nuptial agreement between Wasson and his second wife required the holding that the losses were of the separate property of A. L. Wasson and not of the community.

While, as we have endeavored to show above, we find ourselves in complete agreement with appellants on their point No. 1, the matter stands differently with respect to their other points two to seven. Here we find ourselves in agreement with the action of the district judge, and with the arguments of the appellee in their support, and, without undertaking to deal separately with them, we content ourselves with saying that, to the extent that the judgment is affected by the matters complained of in them, it is affirmed, and to the extent that it is affected by the findings and conclusions that the admitted losses were of community property and attributable one-half to Wasson and one-half to his wife, it is reversed with directions to enter judgment accordingly.